LAW OFFICES OF MICHAEL ANTHONY HERNANDEZ
Michael Anthony Hernandez, Esq.
California State Bar No. 234579
1350 Columbia Street, Suite 700
San Diego, California 92101
Tel.: (619) 341-3149
Fax: (619) 996-2200
Email: Michael@DefenseAttorneySD.com

Attorney for Defendant
Rene Luis Silva

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

(Hon. Larry A. Burns)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br><br>RENE LUIS SILVA,<br><br>　　　　　Defendant | Case No.:  20cr0612-LAB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Date:  March 24, 2021<br>Time: 1:30 p.m. |

**TO:　RANDY GROSSMAN, ACTING UNITED STATES ATTORNEY;
　　　KAREEM SALEM, ASSISTANT U.S. ATTORNEY; and
　　　JILL JOHNSON-POGUE, U.S. PROBATION OFFICER:**

## I.  INTRODUCTION

Given the totality of the circumstances, including the 18 U.S.C. section 3553(a) factors, the life history, and characteristics of the defendant as detailed below, Mr. Silva submits the following memorandum in support of his request for a custodial sentence of 60 months.

## II. INDIVIDUAL BEFORE THE COURT

Rene Luis Silva is a 27 year-old citizen of the United States who now stands before the Court for sentencing in connection with his guilty plea to the charge of importation of methamphetamine in violation of Title 21, United States Code, sections 952 and 960, and importation of fentanyl in violation of Title 21, United States Code sections 952 and 960.

Mr. Silva was born in Los Angeles, California, on July 17, 1993, to Rene Silva (age 47), a part time cook and panhandler currently living in Los Angeles, California, and Elvia Carrasco (age 47), owner and operator of an ice cream truck, also currently living in Los Angeles, California. Rene Silva, Sr. and Elvia Carrasco were not married and currently live separately. Mr. Silva had two biological brothers, both of whom have unfortunately passed away. Fernando, the youngest, passed away shortly after birth due to heart problems. Oscar, the oldest, passed away from heart problems in January 2020, at the age of 43, while Rene was in custody.

Rene Luis Silva was known as being cheerful and gregarious in his youth. However, he was born into a troubled household. When Rene was very young, his parent's relationship began to erode. Rene's father suffered from a significant and lifelong addiction to alcohol which led to consistent instances of domestic violence. The volatility of the home environment and the violence of the abuse were so severe that to escape the abuse, Rene's mother, Elvia, eventually fled with her two sons to live in a shelter. Thereafter, the family lived with extended family or friends for a period of time until they could afford their own apartment. Rene did not see his father very much after the family split up; his father was in and out of jail and various rehabilitation facilities throughout Rene's childhood. Rene was raised essentially without a father.

Rene lived with his mother, and his older brother, Oscar, for his formative years. Rene and his brother Oscar had a very close and special relationship growing up. However, without a true father figure, Rene lacked a positive male role model in his life. Accordingly, his lack of discipline began to manifest when he was in elementary school, and by the 5th grade, he was consistently getting in trouble. At home, Rene's mother was overwhelmed with her work schedule and providing for both Rene and Oscar. Unfortunately, Oscar's heart condition also

manifested at a young age, often requiring trips to the emergency room, and lengthy stays in the hospital. Oscar's condition added a significant amount of financial and emotional stress on Elvia. She did everything that she could to provide for the family, but due to Oscar's condition, she spent an inordinate amount of time caring for Oscar, and very little time with Rene.

Rene's behavior in school continued to degrade as he entered Woodrow Wilson Senior High School. By that point, he was routinely truant and began to fall behind in his classes. While Rene's mother attempted to motivate him, her efforts were unsuccessful. Rene's issue was not aptitude in school – his mother noted that he was quite competent when he was motivated – his issues were a combination of a lack of discipline, and having a propensity for being influenced by some of his delinquent friends.

Eventually Rene was expelled from Woodrow Wilson Senior High School during his 11th grade year. Thereafter, Rene attempted to complete his GED at East Los Angeles Skills Center, but was ultimately unsuccessful. But again, Rene's issue was not aptitude. He was bright, and capable of attaining his GED and or attending a relevant trade school. Unfortunately, like his father, Rene began to suffer from serious addiction issues at a young age. Rene's enrollment at East Los Angeles Skills Center coincided with his introduction to alcohol and drug use. At that time, Rene frequently ditched school to drink with his friends, and was also experimenting with both marijuana and methamphetamine. Eventually, Rene dropped out of the East Los Angeles Skills Center having not received his GED.

By any standard, Rene had a difficult upbringing. He came from a very poor family. His father had been an abusive alcoholic prior to the family escaping to live in a shelter. His beloved brother had been diagnosed with a significant heart ailment, frequently requiring hospitalization. Additionally, Rene received little attention from his mother due to his brother's ailment and her overwhelming work schedule. In short, the odds were already stacked against him, and add to this the lack of a positive male role model in his life. However, his introduction to methamphetamine might have been more destructive than any difficult element of his upbringing. Rene was routinely using methamphetamine by the time he was 20, and his legal troubles began shortly thereafter.

From his late teens to his early 20's, Rene had a job as a handyman at a local apartment complex in Los Angeles. But as his methamphetamine habit usurped control over his life, he

lost his job, and found himself both unemployed and hopelessly addicted.  He began living on the streets as a homeless man, only occasionally visiting his mother's home to have a shower and a meal.  Rene would collect cans and construction materials to recycle, but only in an effort to maintain his habit.  When those efforts were insufficient to support his addiction, he stole.  Rene had frequent encounters with the police for theft, and possession of drugs and or drug paraphernalia.  His consistent interactions with the police also lead to a series of short term incarcerations.  In sum, Rene hit rock bottom by his mid-20's.

When he landed at rock bottom, Rene was destitute.  Fully addicted to methamphetamine, and with an incomplete education and no job prospects, he made one more terrible decision.  Rene agreed to drive a vehicle across the border loaded with drugs for a small sum of money (wildly inconsistent with the risk he was taking).  He was caught, and arrested.  The facts of that arrest are contained within the PSR, incorporated by reference herein, and are uncontested.

While incarcerated for the present offense, Rene was informed that his brother had finally succumbed to his heart ailment.  Rene's brother, Oscar, died in January of 2020.  Rene was crushed.  The news pushed Rene into a deep depression, making him want to give up on life, entirely.  However, over the past several months, Rene has come to believe that his brother would never want him to give up.  Rather, his brother would want him to accept responsibility for what he has done and make something of himself.   This transition has sparked a new-found interest in Rene to earn his GED, and enter into vocational training during his incarceration.  Rene hopes to earn the right to re-enter society prepared to be a positive member of his community for both himself, and to honor his brother's memory.

Rene's story is not one of a criminal master-mind who routinely gamed the system.  Rather, Rene's story is one of a man born into difficult circumstances, who fell victim to drug addiction, and lost his way.  He stands before the Court willing to accept responsibility for his crimes and only hopes that he may be given an opportunity to redeem himself and to eventually re-enter society.  While his guilt in this matter is unquestionable, so, too, is his resolve to make amends and to prove to the Court, to his family, his community, and to himself, that he can be a law-abiding and productive member of society.

Defendant's Sentencing Memorandum

### III.  STATEMENT OF FACTS

The Offense Conduct section of the Presentence Investigation Report (PSR pp. 3-4) accurately reflects the facts in this matter.

### IV.  SENTENCING CONSIDERATIONS

In determining an appropriate sentence, the Court should consider the United States Sentencing Guidelines ("USSG" or the "Guidelines"), the sentencing factors in Title 18, United States Code, section 3553(a), and any other factors pertinent to sentence.  Ultimately the Court's purpose remains to find a reasonable sentence under all of the circumstances that is sufficient, but not greater than necessary, to accomplish the purpose of sentencing.  *See* Title 18, USC, section 3553(a).  Applying those principles, both the Guidelines and the factors outlines in section 3553(a) support a custodial sentence of 60 months.

**A.    The Guidelines**

   1.    The Plea Agreement Summarized

In exchange for Mr. Silva's guilty plea and waiver of his trial and nearly all appellate rights, the parties have agreed to jointly recommend the following Base Offense Level, Specific Offense Characteristics, Adjustments and Departures (if applicable):

   1. Adjusted Base Offense Level ……………………………….38
   2. Importation of Methamphetamine, no minor role…………...+2
   3. Safety Valve (if applicable)…………………..….……….(-2)
   4. Acceptance of Responsibility (USSG §3E1.1(a))..…………..-2
   5. Acceptance of Responsibility (USSG §3E1.1(b))..…………..-1
   6. Combination of Factors/Early Disposition/Fast Track………-4

In addition, the parties have further agreed that Mr. Silva may request or recommend additional adjustments and departures under the USSG and sentencing reductions under 18 U.S.C. section 3553.

5

Defendant's Sentencing Memorandum

2. <u>Base Offense Level/Adjusted Base Offense Level</u>

Defendant pleaded guilty to an information charging him with Importation of Methamphetamine in violation of 21 U.S.C. sections 952 and 960, and Importation of Fentanyl in violation of 31 U.S.C. sections 952 and 960.  Under USSG section 2D1.1(c)(3), the Base Offense Level is 38.  As Mr. Silva is not subject to an adjustment for role under USSG section 3B1.2, two additional points are added to the Base Offense Level, increasing the total from 38 to 40.  Accordingly, his original Base Offense Level is 40.

3. <u>Acceptance of Responsibility</u>

Mr. Silva waived indictment and allowed the government to proceed by way of Information, and he pleaded guilty at an early stage in the case.  Accordingly, there is no dispute that he qualifies for a three-level downward adjustment for acceptance of responsibility.  *See* USSG, section 3E1.1(a) & (b).

4. <u>Combination of Factors/Early Disposition/Fast Track</u>

Mr. Silva pled guilty in a timely manner, and she should receive a four-level downward departure for early disposition and a combination of circumstances under USSG 5K3.1.

5. <u>Advisory Guideline Range</u>

As indicated above, Mr. Silva starts at a Base Offense Level of 40.  With acceptance of responsibility (-3), and early disposition/combination of circumstances (-4), Mr. Silva ends up as a Total Offense Level ("TOL") of 33.  At a TOL of 33 with a Criminal History Category VI, Mr. Silva's advisory guideline range is 235 to 293 months. *See* USSG, Sentencing Table.

B. **<u>Factors Under Title 18, United States Code, Section 3553(a)</u>**

Under the Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007) and *Gall v. United States*, 552 U.S. 38 (2007), when imposing sentence on a criminal defendant the district court must first correctly calculate the advisory sentencing guideline range and then determine an appropriate sentence based on all of

the factors set forth in 18 U.S.C. Section 3553(a).  See *United States v. Carty*, 520 F.3d 984, 991-992 (9th Cir. 2008).   After consideration of these factors, the statute directs the court to impose a sentence that is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing set forth in subdivision (a)(2).  The "parsimony provision" represents the overarching command of the statute.  *Kimbrough v. United States*, 552 U.S. 85 (2007).

After determining the proper advisory Guideline range, the Court must evaluate whether the sentence is substantively reasonable and comports with the purposes of sentencing.  Specifically, federal law requires that the Court consider the following factors in imposing sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
   a. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   b. to afford adequate deterrence to criminal conduct;
   c. to protect the public from further crimes of the defendant; and
   d. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

*See* Title 18, United States Code, Section 3553(a).

Applying these factors, it appears that a variance under Section 3553(a) – albeit greater than the variance recommended by United States Probation – is warranted in this case.

Without question, the offense is serious.  But considering the overall magnitude of the operation involved in these sorts of criminal enterprises, Mr. Silva's involvement is minor.  He played no part in the manufacture or sale of the methamphetamine or fentanyl, had no leadership role, made no executive decisions, and was certainly a disposable part of the of the operation. The services Mr. Silva actually rendered in furtherance of the conspiracy were directly ordered by higher-ups in the conspiracy and involved very low-level activity.  In fact,

Mr. Silva's involvement was almost at the lowest level of the conspiracy (level 8 "Courier," per: *United States Sentencing Commission, Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System*, Ch. 8 at 165-167 (Oct. 2011)) as he was merely tasked with driving a vehicle across the border.

The details of Mr. Silva's arrest are also a strong indication of his level of involvement in the overall operation.[1]  On January 25, 2020, Mr. Silva: (1) approached the border check point in a vehicle that was not his own, containing little or no personal items;[2] (2) stopped short of the booth, abruptly bottoming out the rear of the vehicle[3]; and (3) during questioning, his hands were shaking, his answers were inconsistent, and he avoided eye contact with the DHS officer.[4]  These facts, individually or considered in totality, easily created a reasonable suspicion, in the eyes of the arresting officers, that the vehicle likely contained contraband.[5] These facts also indicate that Mr. Silva was clearly not a sophisticated or trained courier. Rather, these facts strongly suggest the opposite.[6]

Following his arrest, Mr. Silva saved the government time and resources by promptly accepting a plea agreement. Additionally, Mr. Silva has clearly demonstrated acceptance of responsibility for the offense and recognition of his poor judgment.

1. <u>History and Characteristics of Mr. Silva</u>

The history and characteristics of Mr. Silva are documented as set forth in section II, Individual Before the Court, *supra*, and the Presentence Investigation Report, and are incorporated herein by reference.  Mr. Silva is not a sophisticated criminal.  As previously mentioned, Mr. Silva was an unemployed homeless man with a significant methamphetamine addiction.  That said, Mr. Silva does not dispute that he has made a horrible and regrettable

---

[1] See PSIR pp 3-4, paragraphs 5-9.
[2] Mr. Silva claimed it was his uncle's vehicle.  The vehicle was registered to a man named Ricardo Gomez Flores, who had sold the vehicle to a used car lot in Chula Vista in December of 2019.  See PSIR pp 4, paragraph 8.
[3] An overt indication that the vehicle is overweight.  See PSIR pp3, paragraph 4.
[4] See PSIR pp 3-4.
[5] See PSIR pp 3, paragraph 5.
[6] See PSIR pp4, paragraph 9.  The AUSA agrees that "there is no indication SILVA smuggled narcotics in the past."

decision by his involvement in this offense, or that his prosecution and conviction stem from this decision.

In sum, at this point in his life, Mr. Silva is at a crossroads. A long period of incarceration may well likely break his will to be rehabilitated given how close he was to giving up after his brother's death. However, upon significant reflection since his brother's death, Mr. Silva has expressed a sincere desire to attain an education during his incarceration, and participate in vocational training, if available, to ensure a smooth transition into his community upon release. Should the Court agree to a reasonable period of incarceration, Mr. Silva can be rehabilitated.

As noted, Mr. Silva's guilt in this matter is without question. But, so, too, was his willingness to accept responsibility for his actions and expedite the legal process.

2.  Seriousness of the Offense, Respect for the Law, and Just Punishment

Upon reflection during his incarceration, Mr. Silva has recognized and contemplated the seriousness of the present offense. Based on the totality of the circumstances, however, a sentence of 60 months adequately reflects the nature of the offense.

Similarly, such a sentence would promote respect for the law. In fact, the offense has already resulted in Mr. Silva gaining full knowledge of the seriousness of his acts, and imposed a willingness in him to refrain from any and all illegal activities in the future.

Just punishment should always be a goal of the Federal Government where circumstances demand it. However, as noted, an extreme custodial sentence in this case is not warranted. Mr. Silva was, undoubtedly, at the very lowest level of the crime he engaged in. Additionally, he is a homeless man who was heavily addicted to methamphetamine.

Again, Mr. Silva's guilt in this matter is unquestioned. However, for all of the aforementioned reasons, the facts and circumstances surrounding this case warrant a departure from the sentencing guidelines. Accordingly, Mr. Silva respectfully requests that the Court consider a custodial sentence of 60 months for his crimes.

3.  Deterrence

A sentence of 60 months also promotes deterrence. Anyone in Mr. Silva's position would surely reconsider engaging in future criminal activity (and particularly, the drug trade) if

they knew that even with all possible departures and adjustments, a staggering custodial sentence would be recommended by the Guidelines. There is also little evidence that significantly longer sentences provide additional deterrence to potential offenders.

4. <u>Protecting the Public</u>

In the present case, a 60 month custodial term would represent the maximum necessary term to protect the public from Mr. Silva. In that time, Mr. Silva will have the opportunity to atone for his crimes, receive educational services and vocational training, and participate in substance abuse counseling and rehabilitative programs.

5. <u>Providing Vocational or Educational Training and Medical Care</u>

Mr. Silva is a perfect candidate for both vocational and educational training. He has expressed a willingness to participate in any available programs. Mr. Silva would greatly benefit from the opportunity to complete his GED and, or, participate in other educational opportunities. Additionally, Mr. Silva would greatly benefit from vocational training, of any kind. Mr. Silva is both willing and motivated to rehabilitate himself. Involvement in any available vocational or educational programs would enhance that process. As well, Mr. Silva would be a prime candidate for the RDAP program.

6. <u>Summary and Request for Variance</u>

As per the above analysis, nearly all of the sentencing factors under section 3553(a) cut in favor of a variance from the advisory Guidelines. Thus, a variance from the advisory Guideline range of 188-235 months is warranted in the present case. Accordingly, Mr. Silva respectfully submits that a sentence of 60 months in custody would provide the right balance for such a variance.

### V. RECOMMENDATION AND CONCLUSION

Considering the totality of the circumstances, Mr. Silva respectfully requests that this Court impose a sentence of 60 months in custody. Such a sentence is sufficient to adequately punish Mr. Silva and deter him from ever repeating such behavior, while not being

unnecessarily harsh.  This sentence will also allow for just punishment given the facts and circumstances as described herein.

Dated: March 22, 2021                              Respectfully submitted,

                                                s/ Michael Anthony Hernandez, Esq.
                                                Attorney for Defendant
                                                Rene Luis Silva

Defendant's Sentencing Memorandum